Stephen F. Noel  (7952)
Thomas Walker Farrell (13697)
**SMITH KNOWLES, P.C.**
2225 Washington Boulevard, Suite 200
Ogden, UT  84401
Telephone:          (801) 476-0303
Facsimile:          (801) 476-0399
Email:       snoel@smithknowles.com
               tfarrell@smithknowles.com

*Attorneys for Defendants*

---

### IN THE UNITED STATES DISTRICT COURT DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| HAROLD MARK TORBETT (A.K.A. MARK TORBETT) and REGINA TORBETT, <br><br> Plaintiffs, <br><br> vs. <br><br> THE CITY OF OGDEN, OGDEN CITY POLICE DEPARTMENT, CODY MARSH, Z. MARTIN, T. WILLIAMS, <br><br> Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br><br> Case No. 1:16-cv-00044-BSJ <br> Judge:  Bruce S. Jenkins |

Defendants, The City of Ogden, Ogden City Police Department, Cody Marsh, Z.

Martin and T. Williams by and through their attorneys, Stephen F. Noel and Thomas

Walker Farrell of Smith K n o w l e s , PC, and pursuant to Federal Rule of Civil Procedure

56, Utah District Local Rules, and other applicable federal and state law, hereby submits

its Motion for Summary Judgment, and, as grounds therefor, states:

## **STATEMENT OF RELIEF SOUGHT AND GROUNDS THEREFORE**

The Defendants seek an order of the Court granting summary judgment in this matter

finding that the Defendants are entitled to qualified immunity for their actions.

## **UNDISPUTED FACTS[1]**

1. On February 8, 2016, the Plaintiff entered the Ogden City Police Department with a
   Walther PP .22 caliber handgun.

2. Officers Travis Williams, Cody Marsh and Zachary Martin responded to a radio call
   regarding a man with a gun in the Ogden City Police Department. See Exhibit A,
   Deposition of Travis Williams, P. 30, L. 14- P. 32, L. 20, See Exhibit B, Deposition of
   Zachary Martin, P. 26, L. 20-21, See Exhibit C, Deposition of Cody Marsh, P. 31, L. 11-
   12.

3. The entirety of the interaction between the Plaintiff and Officers Williams, Martin and
   Marsh took approximately 7 minutes. See *Court Docket, entry #21*, Plaintiff's Amended
   Complaint, ¶¶ 18-21.

4. Officers Williams and Martin were already in an office at the same police department,
   while Officer Marsh was patrolling nearby. Exhibit A, Williams, P. 31, L. 20-25.

---

[1] The citations referencing certain parties or persons are to their respective depositions, which are attached and
incorporated herein by this reference.

5. Officers Williams and Martin approached the Plaintiff while he was still in the lobby of the Ogden City Police Department with the handgun sitting on the couch next to him. Exhibit A, Williams, P. 32, L. 13-20, P. 33, L. 2-9.

6. Officer Williams was able to recover the handgun, which remained at the Plaintiff's side. Exhibit A, Williams, P. 32, L. 18-20.

7. Officer Williams testified the handgun was still intact. Exhibit A, Williams, P. 37, L. 1-4.

8. The Plaintiff does not hold a concealed weapons permit in Utah or any other state. See Exhibit D, Deposition of Mark Torbett, P. 67, L. 4-15.

9. During his interaction with law enforcement, the Plaintiff indicated that he had been shot and that he had been poisoned. Exhibit A, Williams, P. 33, L, 7-9.

10. During the interaction with law enforcement, the Plaintiff became aggressive but the officers were able to calm him down. Exhibit A, Williams, P. 34, L. 5-10.

11. The Plaintiff threatened to knock out officer Williams. Exhibit A, Williams, P. 34, L. 9.

12. The Plaintiff would be calm during portions of the interaction and then return to being agitated and aggressive. Exhibit A, Williams, P. 40, L. 1-8.

13. The Plaintiff again then became very aggressive and attempted to leave the police station. Exhibit A, Williams, P. 40, L. 16-20.

14. Officer Williams put out his arm to stop the Plaintiff. Exhibit A, Williams, P. 40, L. 16-20.

15. The Plaintiff knocked Officer Williams' arm away. Exhibit A, Williams, P. 40, L. 18.

16. The Plaintiff was detained because there was a fear that he would be a danger to others. Exhibit A, Williams, P. 53, L. 22 – P. 54, L. 14.

17. Officer Williams perceived the Plaintiff to be non-responsive and had been reported to have been carrying a concealed firearm. Exhibit A, Williams, P. 54, L. 15 – 55, L. 2..

18. The officers' understanding was that the Plaintiff had been poisoned, that there may have been a shooting somewhere in Ogden City and there may have been someone who had been injured in the city. Exhibit A, Williams, P. 54, L. 1-8.

19. Approximately 3 ½ minutes into the 7 minute interaction, medical services were called. Exhibit A, Williams, P. 31, L. 3-15.

20. Officer Zachary Martin perceived the Plaintiff to be acting strangely. Exhibit B, Martin, P. 28, L. 13 – 22.

21. This perception was based upon the fact that the Plaintiff had been reported to have brought a concealed firearm into the police station and told the officers that people had been shooting at him, that he had been poisoned and that he was being followed. Exhibit B, Martin, P. 28, L. 17 – 25; Exhibit C, Marsh, P. 32, L. 14-23.

22. Officer Martin perceived the Plaintiff to be acting aggressively. Exhibit B, Martin, P. 29, L. 1 – 12.

23. Officer Marsh perceived the Plaintiff to be acting erratically where he was rambling about being poisoned and somebody following him "while looking out the windows like he's being followed." Exhibit C, Marsh, P. 32, L. 14-23.

24. The Plaintiff said to Officer Martin, "You are a fucking dumbass" in response to Officer Martin telling the Plaintiff that a person needed a concealed carry permit to carry a concealed firearm.  Exhibit B, Martin, P. 29, L. 3-4.

25. The Plaintiff attempted to leave several times.  Exhibit B, Martin, P. 29, L. 6-7, Exhibit C, Torbett, P. 82, L. 6-7, P. 85, L. 17-20.

26. The Officers had a fear that the Plaintiff might have a gun in his car.  Exhibit B, Martin, P. 45, L. 23-25.

27. The Officers were of the opinion that if the Plaintiff were to be allowed to leave, he would have posed a public safety concern because "he wasn't obviously thinking in his right mind" and the potential to have access to another firearm posed a risk to the public and to the Plaintiff's safety.  Exhibit B, Martin, P. 46, L. 1-15

28. The Plaintiff was told not to stand just yet.  Exhibit D, Torbett, P. 86, L. 7-17.

29. The Plaintiff again attempted to leave the police station.  Exhibit D, Torbett, P. 88, L. 1-7.

30. Law enforcement attempted to restrain the Plaintiff from leaving.  Exhibit D, Torbett, P. 88, L. 4-10.

31. When the Plaintiff stood up and started to walk towards the front door, Officer Williams held out his arm to stop the Plaintiff.  Exhibit A, Williams, P. 34, L. 16-17.

32. The Plaintiff knocked Officer Williams' arm out of the way.  Exhibit A, Williams, P. 34, L. 16-18.

33. The Plaintiff pulled his arm away when law enforcement attempted to restrain him. Exhibit D, Torbett, P. 88, L. 12-17, P. 89, L. 6-14.

34. The Plaintiff was shaking his soda bottle at the officers and got the liquid on Officer Martin's face. Exhibit C, Marsh, P. 34, L16-19.

35. The Plaintiff was taken to the ground immediately after he pulled his arm away. Exhibit D, Torbett, P. 91, L. 24.

36. Officer Martin was concerned that the Plaintiff was acting strangely. Exhibit B, Martin, P. 44, L. 21-24.

37. The Plaintiff's strange behavior caused Officer Martin to be concerned for the Plaintiff's safety and the general public's safety. Exhibit B, Martin, P. 44, L. 25 – P. 45, L. 22.

38. Officer Martin was concerned that if the Plaintiff was permitted to leave he would have posed a public safety issue and would have posed a danger to himself. Exhibit B, Martin, P. 46, L. 1 – 15.

39. The officers could only perceive the outward appearances that the Plaintiff was presenting. Exhibit D, Torbett, P. 98, L. 1-7.

40. The Plaintiff told Officer Marsh that he had his firearm concealed under his waistband of his shirt. Exhibit C, Marsh, P. 57, L. 25- P. 58, L. 5

41. Law enforcement's concern was that the Plaintiff was going to try to get out the door before medical assistance arrived. Exhibit C, Marsh, P. 46, L. 13-20.

42. Officer Marsh was attempting to control the Plaintiff's hands to control the safety of the situation. Exhibit C, Marsh, P. 46. L. 22 – P. 47, L. 5.

43. The Plaintiff was able to break free from the handhold that the officers had on him. Exhibit D, Torbett, P. 92, L. 5-14

44. Law enforcement perceived that they had probable cause to arrest the Plaintiff for disorderly conduct, resisting and carrying a concealed firearm. Exhibit C, Marsh, P. 56, L. 2-25.

45. The Plaintiff admits he was afraid and his heart was racing when he entered the Ogden City Police Department. Exhibit D, Torbett, P. 76, L. 6-16.

46. The Plaintiff did not know what was affecting him but thought he may have had food poisoning. Exhibit D, Torbett, P. 77, L. 13-16.

47. The Plaintiff thought the police assumed he was on drugs. Exhibit D, Torbett, P. 98, L. 4-7.

48. As soon as Mr. Torbett was taken to the ground, medical assistance arrived. Exhibit A, Williams, P. 35, L. 20-21.

49. The Plaintiff admits he carried his firearm in his laptop bag with a loaded magazine but claims the magazine was separate from the gun. Exhibit D, Torbett, P. 53, L. 13-25.

50. However, the Plaintiff also claims to have had an extra round in his laptop bag. Exhibit D, Torbett, P. 72, L. 17-23.

51. Law enforcement was told that the Plaintiff entered the Ogden City Police Station with a concealed, loaded firearm and the Plaintiff took the firearm out of his waistband, ejected the magazine from the firearm and ejected a round from the firearm. Exhibit C, Marsh, P. 38, L. 21 – P. 39, L. 6.

52. The Plaintiff did not have a concealed carry permit in Utah or any other state.  Exhibit D, Torbett, P. 67, L. 4-15.

53. The Plaintiff is an insulin-dependent diabetic.  Exhibit D, Torbett, P. 8, L. 22-25.

54. The Plaintiff admits he thought it was unsafe for him to drive because he was weak, dizzy and did not know what was wrong with him.  Exhibit D, Torbett, P. 62, L. 25 – P. 63, L. 12.

55. When the Plaintiff was taken to the hospital, he was diagnosed with diabetic ketoacidosis. See Plaintiff's Amended Complaint, ¶22, Torbett, P. 61, L. 23 – P. 62, L. 8. See also Exhibit E, Medical Records from McKay Dee Hospital.

56. The Plaintiff was also seen by the hospital for delirium and paranoia.  See Exhibit E, McKay-Dee Records.

57. The entirety of the interaction between law enforcement and the Plaintiff took approximately 7 minutes.  See *Court Docket, entry #21*, Plaintiff's Amended Complaint, ¶¶19-21.

58. The Plaintiff's excessive force expert admits that:

   **a.** The Officers had reasonable suspicion to conduct an investigation (Exhibit F, Hergert, P. 20, L. 7-25);

   **b.** The Officers were justified in using force against Plaintiff (Exhibit F, Hergert, P. 67, L. 19-24);

   **c.** The Officers' actions of going "hands on" the Plaintiff were not unreasonable (Exhibit F,  Hergert, P. 68, L. 7-10);

**d.** The Officers were attempting to de-escalate the situation (Exhibit F, Hergert, P. 72, L. 1-12).

59. The Officers attempted to de-escalate the situation. Exhibit A, Williams, P. 34, L. 10-15.

60. Plaintiff has not designated any retained experts, other than a use of force expert. *See* Exhibit G, Plaintiff's Disclosure of Expert Testimony, dated January 2, 2018.

61. Plaintiff's only possible designation of a medical expert, retained or otherwise, was limited to a one line designation in paragraph 2(A) of Plaintiff's Initial Disclosures, which states "[a]ny and all medical professionals involved in Mr. Torbett's care." *See* Exhibit H, Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated June 10, 2016; and a vague non-retained experts statement in the Plaintiff's most recent expert disclosures. Exhibit G, Plaintiff's Disclosure of Expert Testimony, dated January 2, 2018.

62. There is no evidence in the record that the Officers, the Police Department or Ogden City were deliberately indifferent in any respect to the Plaintiffs, whether regarding training, conduct or supervision.

63. There is no evidence in the record that Ogden City had adopted, implement or otherwise followed any policy resulting in Plaintiff's alleged injuries and/or violations of his rights.

## MEMORANDUM OF LAW

### I.     Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A mere factual  dispute will not preclude summary judgment; rather there must be a genuine issue of

material fact. *See Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000). Courts need not blindly accept plaintiffs' often one-sided version of events; it is the "factual matrix" most favorable to the Plaintiff that this Court must consider. *See Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir.2003); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (stating that courts should decline to adopt a party's narrative of events if it is blatantly contradicted by the record).

In opposing summary judgment the Plaintiff must provide "significant probative evidence tending to support the complaint." *First Nat'l Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 290 (1968). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986)(citations omitted).

Finally, a motion for summary judgment based on qualified immunity also places additional burdens on the plaintiff that are not found in the typical summary judgment setting. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). In order to overcome a defense of qualified immunity, the plaintiff must do more than simply identify in the abstract a clearly established right and allege that the defendant has violated it. *Id*. (citing *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990)). Rather, the plaintiff must articulate the clearly established constitutional right and the defendant's conduct that violated the right with specificity, and demonstrate a substantial correspondence between the conduct in question and prior law that establishes that the defendant's actions were clearly prohibited. *See Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988); *Romero*, 45 F.3d at

1475 (citing *Hovater v. Robinson*, 1 F.3d 1063, 1066 (10th Cir. 1993)). "Unless such a showing is made, the defendant prevails." *Romero*, 45 F.3d at 1475 (quoting *Losavio*, 847 F.2d at 646).

## II. Ogden City and Its Law Enforcement Officers are Entitled to Qualified Immunity under the Specific Facts of this Case.

A defendant is only responsible to a plaintiff, if that defendant, by its actions, intentionally violated the plaintiff's constitutional rights. *See generally*, *Oliveros v. Mitchell*, 449 F.3d 1091, 1095 (10th Cir. 2006) (excessive use of force and unreasonable seizure claims in violation of the *Fourth Amendment* rights are necessarily predicated on intentional conduct). A defendant, by his conduct, cannot accidentally violate a person's Fourth Amendment rights. *Medina v. Cram,* 252 F.3d 1124 (10th 2001). The court in *Medina* held that in order to constitute a Fourth Amendment violation, the conduct "must rise to the level of recklessness, rather than negligence." *Id. at 1132.* For example, providing incorrect information to an officer of one agency by another agency is not necessarily a civil rights violation although the misinformation may have contributed to the arrest of a person. A clerical mistake, for instance, would be insufficient. However, if incorrect information was provided intentionally so as to result in an improper arrest, the agency providing the information may owe damages to the plaintiff. Merely playing a "part" in an action that may lead to an arrest, on the other hand, is legally insufficient to state a claim for a Fourth Amendment violation.

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Koch v. City of Del City*, 660 F.3d 1228,

1238 (10th Cir. 2011). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment...." Id.

*Redmond v. Crowther*, No. 16-4131, 2018 WL 798283, at *2 (10th Cir. Feb. 9, 2018).

To qualify as clearly established, a constitutional right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, —— U.S. ——, ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015).

*Redmond v. Crowther*, No. 16-4131, 2018 WL 798283, at *3 (10th Cir. Feb. 9, 2018). It is a "longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*, —— U.S. ——, ——, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam). The "dispositive question is whether the violative nature of particular conduct is clearly established." *Mullenix*, 136 S.Ct. at 308. We therefore must determine whether a right is clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.*; see also *White*, 137 S.Ct. at 552.

The Plaintiff has failed to identify what clearly established law the Defendants have violated. While the Plaintiff has attempted to claim that his claims rest on an alleged violation of his Second Amendment rights, the facts of this case do not support such a claim. The facts presented to law enforcement at the time were that the Plaintiff had entered the Ogden City Police Station with a concealed, loaded firearm, and that the Plaintiff, when confronted by law enforcement, was acting aggressively, threatened bodily harm to the officers, was non-responsive to the officers and claimed someone was trying to shoot him or poison him. All of these facts, combine to raise a reasonable suspicion that an investigatory detention was necessary. *See Terry*

*v. Ohio,* 392 U.S. 1 (1968).  Despite law enforcement's attempt to investigate whether the Plaintiff was shot at, poisoned or why he brought the firearm into the police station, the Plaintiff attempted to leave while being questioned and pulled his arm away.  Only then was he taken to the ground to gain control, resulting in his injury.

Qualified immunity shields government officials who perform discretionary functions from § 1983 damages suits so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Gomes v. Wood,* 451 F.3d 1122, 1134 (10th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818)(1982)).  When a state official asserts qualified immunity, they create a rebuttable presumption  that they are immune from the plaintiff's § 1983 claims.  *See Medina v. Cram*, 252 F.3d 1124,  1129 (10th Cir. 2001).  The Tenth Circuit has held that qualified immunity protects "all but the  plainly incompetent or those who knowingly violate the law." *Gross v. Pirtle*, 245 F.3d 1151,  1155 (10th Cir. 2001).  Qualified immunity may be denied "only if, on an objective basis, it is  obvious that no reasonably competent [official] would have concluded that the actions were constitutional." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006).  But, "'if [officials] of reasonable competence could disagree' about the lawfulness of the challenged conduct, then '[qualified] immunity should be recognized.'" *Id.* at 1136 (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The foregoing facts indicate, at the very least, law enforcement had a reasonable suspicion to conduct an investigatory detention.  When the Plaintiff, attempted to pull away, it was necessary to gain control of him.  There was no clearly established right that was violated.

**III.** **There was No Excessive Force in Taking the Plaintiff to the Ground for his Safety**

The specific facts of this case are insufficient, as a matter of law, to find that there was

excessive force when the Plaintiff was taken to the ground for his safety and that of others.

> "[A]n excessive force claim involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Giron v. Corr. Corp. of America*, 191 F.3d 1281, 1289 (10th Cir. 1999)

*Redmond v. Crowther,* No. 16-4131, 2018 WL 798283, at *4 (10th Cir. Feb. 9, 2018).

To reiterate qualified immunity in the excessive force context, the plaintiff must show both

that "under the facts alleged by the plaintiff, the government officials violated a constitutional

right," and that "the right at issue was 'clearly established' at the time of the defendant's

alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The district court first

determines whether the law was clearly established at the time of the incident in question. *Id.*

at 236. If the law was not clearly established at the time of the alleged violation, the government

official is entitled to qualified immunity, and the court need not determine whether the

plaintiffs' constitutional rights were violated as alleged.

The clearly established right standard is "exacting." *City & Cnty. of San Francisco,*

*Cal. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015). It requires a plaintiff to demonstrate that

"existing precedent placed the statutory or constitutional question beyond debate." *Id.* (citation

omitted). The Supreme Court has emphasized that this is a factually intensive inquiry based on

the specific facts of the case because "[S]uch specificity is especially important in the Fourth

Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). (citing *Saucier*, 553 U.S. at 205, 121 S.Ct. at 2151)).

Furthermore, the relatively minor nature of an offense is irrelevant to an officer's decision to effect a custodial arrest. Indeed, in *Atwater v. City of Lago Vista*, 532 U.S. 318, 323, 121 S.Ct. 1536, 1541 (2001), the defendant was under custodial arrest for violating a safety belt law that carried a $50 fine as its maximum penalty. The Court found that the warrantless arrest did not violate the Fourth Amendment. *Id.*

The Tenth Circuit Court of Appeals has recognized that a small amount of force is permissible in effecting an arrest. *Cortez v. McCauley,* 478 F.3d 1108, 1128 (10th Cir. 2007).

> We have recognized that, given evidence of officer safety concerns, officers may in appropriate circumstances take steps to protect their personal safety and maintain the status quo during a *Terry* stop. *Gallegos v. City of Colorado Springs,* 114 F.3d 1024, 1030–31 (10th Cir.1997); *Perdue,* 8 F.3d at 1463. Although *Terry* stops are normally non-intrusive, we have indicated that law enforcement may (1) display some force, (2) **place suspects on the ground**, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause. *Perdue,* 8 F.3d at 1463. At the same time, "an unreasonable level of force transforms a *Terry* detention into an arrest requiring probable cause." *United States v. Shareef,* 100 F.3d 1491, 1507 (10th Cir.1996); *see also Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality op.).

*Cortez v. McCauley*, 478 F.3d 1108, 1130 (10th Cir. 2007)(Emphasis Added).

> The touchstone of the reasonableness inquiry in an excessive force claim, as in any other claim arising out of the Fourth Amendment, is whether the officers' actions are *objectively unreasonable.* The inquiry focuses not on the officers' particular motivations, nor on the arrestee's subjective perception of the intrusion, but on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

confronting them." *Id.* at 397, 109 S.Ct. 1865.

*Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).

The application of *Cortez* and *Fisher* is appropriate to the instant case. The Plaintiff in the instant case was exhibiting irrational behavior and making comments that would cause a reasonable officer to be concerned, e.g. "you're a fucking dumbass" and "I'm going to knock you out". Overlay those comments on the fact that the Plaintiff was reported to have entered into the police station with a loaded, concealed firearm while not having a concealed carry permit, and the officers have a duty to investigate the situation. While the Plaintiff suffered an unfortunate injury, the level of force used in this matter is no greater than that which was necessary to detain the Plaintiff for the short period of time needed until medical arrived based on Plaintiff's escalation of the situation by pushing Officer Williams' arm away and the Plaintiff pulling his own arm away when the attempt was made to control the Plaintiff's hands. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See *Terry v. Ohio, supra,* 392 U.S., at 20–22, 88 S.Ct., at 1879–1881. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers," *Johnson v. Glick,* 481 F.2d, at 1033, violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72, 104 L. Ed. 2d 443 (U.S. 1989).

Courts are cautioned not to employ "the 20/20 vision of hindsight" when undertaking Fourth Amendment reasonableness evaluations. *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012) (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989)). As in this case, officers on the scene "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872.

The Defendants recognize that the Plaintiff has, obliquely, made claims regarding the Defendants' failure to recognize that he was having a medical situation. The Defendants would note, however, that the Plaintiff himself did not know what his medical condition was, despite the fact that he is diabetic and has been for years prior to the incident. In fact, the Plaintiff, in his deposition, attempted to claim that his diabetic ketoacidosis was the result of the broken hip, rather than his failure to keep on top of his blood sugars. See Exhibit D, Torbett, P. 61, L. 23 – P. 62, L. 2. Moreover, there are no facts in the record which establish what difference, if any, the Officers' alleged failure to properly diagnose Plaintiff's medical condition would have made in the outcome of the encounter. Common sense dictates that the Officers' actions were justified whether the Plaintiff suffered from a mental disorder, diabetic ketoacidosis, or nothing at all.

Plaintiff entered the police station and began informing staff and police officers that people were following him, that he suspected he was being poisoned, and that there were people

threatening to cause him physical harm. Plaintiff had a loaded firearm with him. Justifiably, the

Officers became increasingly concerned about his physical and mental safety and the threat that

he posed to himself and others. When Plaintiff indicated that he was going to leave, he was

informed that he could not yet leave the station and was not allowed to do so; the justification

for the Oficer's actions was clear: Plaintiff clearly posed a risk of harm to himself or others.

Despite this, Plaintiff resisted and attempted to escape, violently confronting the officers who

stymied his attempt. In the ensuing commotion, Plaintiff, unfortunately, was injured. Utah Code

Section 76-8-305 states that:

> A person is guilty of a class B misdemeanor if he [or she] has knowledge,
> or by the exercise of reasonable care, should have knowledge, that a peace
> officer is seeking to effect a lawful arrest or detention of himself [or herself]
> or another and interferes with such arrest or detention by use of force or by
> use of any weapon.

Plaintiff's agitated and bizarre behavior, coupled with his rantings about threats made to

him and the presence of a firearm, justified the Officer's command that he remain, and their

detention of Plaintiff in order to mitigate and resolve the risk of harm. *See State v. Tehero*, 147

P.3d 506, 507-08 (Utah Ct. App. 2006) (citing *State v. Markland*, 112 P.3d 507, 509 n. 1 (Utah

2005)). The officers had an articulable suspicion—based upon Plaintiff's erratic behavior and

possession of a loaded firearm—that Plaintiff was a threat to himself and others and were

justified in detaining him in order to investigate the extent of the risk.

In Utah there is no right to physically resist either an arrest or an order of the police as

long as the officers are within the scope of their authority. *See State v. Trane*, 57 P.3d 1052. 1061

(Utah 2002) (citing *State v. Gardiner*, 814 P.2d 568 (Utah 1991)). Plaintiff's actions, combined

with his erratic and violent language and possession of a firearm, justified the officer's arrest and

subduing of his person. *See Youbyoung Park v. Gaitan*, 680 Fed. Appx. 724, 739-40 (10th Cir.

2017) (finding that the plaintiff's active resistance to arrest justified the use of additional force).

In cases of physical resistance to detention or arrest, as here, officers may employ the amount of

force necessary to complete the arrest. *See Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016).

If the officers believe (even mistakenly) that the arrestee will continue to fight back, then they

may use "more force than in fact" necessary. *See Youbyoung Park*, 680 Fed. Appx. at 739-40

(citing *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

       Plaintiff's refusal to heed the officer's order to remain in the police station was a

violation of Utah law. The police officers present were justified in his detention of Plaintiff, as

Plaintiff's irrational and erratic conduct, coupled with his apparent mental instability and

possession of a firearm, gave the Officers an articulable suspicion on which to detain Plaintiff for

further questioning and examination.

### IV.     There is no Evidence to Support Plaintiffs' Claims against Ogden City and its Police Department.

       To begin, the Ogden City Police Department is not a proper party or entity against which

a claim can be alleged or maintained. The Police Department is just that; a department within the

City. It is not separately chartered and should be dismissed from this matter pursuant to Rule

12(b)(7) and Rule 19(a) of the Federal Rules of Civil Procedure.

As for the viability of the claims against Ogden City and its Police Department, there is no evidence that either had adopted or maintained any policy or custom which violated the Plaintiffs' rights. A municipality or local governing body may be sued directly under § 1983 *only* when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Soc. Svcs.,* 436 U.S. 658, 690 (1978). Importantly, this standard precludes cities from being held vicariously liable for the actions of its employees or agents. *Id*. at 690 ("[L]ocal government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."). Ogden City and its Police Department have not adopted or promulgated any policy statement, ordinance, regulation, decision or custom which implements or executes excessive force or any violation of the Plaintiffs' rights under § 1983.

### V.    Regina Torbett's Claim of Consortium is Derivative of the Plaintiff's Claims and should be Dismissed.

Plaintiff, Regina Torbett, has made a claim for consortium in the instant case. She does not have an independent claim in this action. As this incident is alleged to have happened in Ogden, City Utah, Utah Code Annotated 30-2-11 governs the consortium claims alleged in this case. See U.C.A. §30-2-11(1). A claim for a spouse's loss of consortium is subject to the same defenses, limitations, immunities, and provisions applicable to the claims of the injured person. U.C.A. §30-2-11(4)(b). Ms. Torbett's claim is derivative to Mr. Torbett's claim and does not exist where Mr. Torbett does not have a cause of action. See U.C.A. §30-2-11(5). Thus, where

Mr. Torbett's claims fail for the foregoing reasons, Ms. Torbett's claims, necessarily, must fail also.

**VI.    Any Claims for Lost Earning Capacity and/or Future Medical Expenses Fail as a Matter of Law**.

As noted above, Plaintiff Mark Torbett has failed to appropriately plead any special damages, including any for lost earning capacity, yet Plaintiff did reference "lost future wages" in his initial disclosures. However, he failed to provide any calculation for those damages. Also, the Plaintiff has not identified any expert to opine regarding the Plaintiff's lost earning capacity. The only expert the Plaintiff has identified to render an opinion is the Plaintiff's use of force expert.  Such a failure to have expert opinion on this issue is fatal to the Plaintiff's claim.

The Plaintiff appears to be arguing that he has lost earning capacity based on an alleged head injury.  "Where the injury is obscure, as here, a loss of future earnings capacity must be established by expert medical testimony in order to avoid pure speculation on the part of the jury. Curtis v. General Motors Corp., 649 F.2d 808, 813 (10th Cir.); Rheaume v. Patterson, 289 F.2d 611, 613 (2d Cir.)."  Parra v. Atchison, Topeka & Santa Fe Ry. Co., 787 F.2d 507, 509 (10th Cir. 1986).  In the instant case, the Plaintiff has not identified any medical expert to render an opinion about the Plaintiff's lost earning capacity.

There is no expert to opine regarding Plaintiff's ability to work at all, or the present value of any such loss in earning capacity. Such needed experts would include a medical professional to assesses Plaintiff's alleged injuries and their impact on his ability to earn a living, a vocational expert to opine on the specific interplay between the alleged injuries and Plaintiff's ability to

work and to what extent, along with training necessary and/or available to Plaintiff to mitigate against the effects of the injury, and an economist to determine the financial impact of the alleged injury upon the Plaintiff. In assessing damages for loss of future earning capacity, the trier of fact must reduce a lump sum award to its present value. *Chesapeake & Ohio Railway v. Kelly*, 241 U.S. 485, 489-91, 36 S.Ct. 630, 631-32, 60 L.Ed. 1117 (1916). See also *Steckler v. United States*, 549 F.2d 1372, 1378 (10th Cir. 1977); *Deweese v. United States*, 576 F.2d 802, 808-09 (10th Cir. 1978). The Court must calculate an amount of money that can be invested in a reasonably safe long-term investment available to the average person, which ultimately will yield a sum equal to plaintiff's lost income over the span of his working life expectancy. *Id.* This requires an expert, without which the jury will be left to speculate.

Likewise, Plaintiff has not disclosed any expert to opine about any future effects of his alleged injuries. While the Plaintiff has identified certain treating physicians, he has not disclosed any summary of opinions or the facts upon which those opinions are based as is required for non-retained experts. Rule 26(2)(C) requires that for each non-retained expert, the party must disclose:

(i)     the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
(ii)    a summary of the facts and opinions to which the witness is expected to testify.

Even if Plaintiff expected to testify about any such damages, the Plaintiff should have been designated as an expert for that limited testimony, which he was not. The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the body of

case law that has developed from the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*509 U.S. 579 (1993). Under Rule 702, expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Rule 702 also requires that (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Id.* This rule "applies to all expert testimony, not just testimony based on science." *Durkin v. Equifax Check Servs.* 406 F.3d 410, 420 (7th Cir.2005). The Plaintiff has not disclosed any such testimony in support of claim alleged in his complaint, other than the use of force. Therefore, the Plaintiff's claims for such damages must fail.

## VII. Plaintiff's Claim under Section 1981 is not Applicable to this Case.

42 U.S.C. § 1981 is entirely inapplicable to the facts of this case. Section 1981 was enacted as Section 1 of the Civil Rights Act of 1866 to protect against discrimination on the basis of race or alienage. *See Garner v. Giarrusso*, 571 F.2d 1330, 1340 (5th Cir. 1978). Section 1981 is most often invoked in contractual matters, although it is not confined to that context. *See, e.g., Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). It deals with the protection of a limited range of civil rights and seeks to prevent "[r]acially motivated misuse of governmental power" where one of the enunciated rights is denied. *See* H*all v. Pennsylvania State Police,* 570 F.2d 86, 91 (3d Cir.1978). To establish a prima facie case of discrimination under Section 1981, Plaintiff must show (1) that he is a member of a protected class; (2) that defendants had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected

activity as defined in Section 1981. *Barfield v. Commerce Bank, N.A.,* 484 F.3d 1276, 1277 (10th Cir.2007).

Plaintiff cannot meet a single element of this claim. There is no evidence that Plaintiff is a member of a protected class. Furthermore, being white, there is no evidence that the officers intended to discriminate against him on the basis of race. Finally there is no evidence that any alleged discrimination interfered with a protected activity as defined in Section 1981.

## VIII. Plaintiff's State Constitutional Claims Fail.

Plaintiff claims that Defendants violated his rights guaranteed by the Utah Constitution. Specifically, Plaintiff claims that Defendants violated Article 1, Section 1, 7, 9, 14, and 25 of the Utah Constitution. However, Plaintiff's claims entirely revolve around his detention and arrest at the police station. Plaintiff has articulated no due process violation independent of those acts. When bringing claims for a violation of a constitutional right, the choice of amendment or provision on which the right is predicated is crucial to an adjudication of the claim. *See Graham v. Connor,* 490 U.S. 386, 394-95 (1989). The Fourth Amendment, or Article 1, Section 14 of the Utah Constitution, provide the explicit textual source of constitutional protection for illegal detention and arrest. *See Baker v. McCollan,* 443 U.S. 137, 144-45 (1979). In addition, Article 1, Section 9 of the Utah Constitution provides additional protection to persons under arrest or imprisonment.

Any claim for an illegal detention and false arrest is cognizable only under Article 1, Sections 9 and 14, and not Article 1, Sections 1, 7, and 25. Plaintiff has articulated no independent basis for a due process violation apart from his detention and arrest. Thus, Plaintiff has failed to establish any cause of action under Article 1, Sections 1, 7, and 25 of the Utah Constitution against Defendants.

Plaintiff's state constitutional claims fail because he cannot show that he suffered a flagrant violation of his constitutional rights under either Article 1, Section 9 or Section 14. Damage actions for alleged violations of self-executing constitutional clauses are permitted only "under appropriate circumstances." *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, ¶ 23, 16 P.3d 533. Specifically, Plaintiff must establish three elements before he may proceed with his suit for damages. *Id*. In this case, Plaintiff cannot establish the first of the three elements and therefore discussion of the remaining two elements is unnecessary at this time.[2]

The first element requires that Plaintiff establish a "flagrant" violation of rights. *Id*. the Utah Supreme Court has stated that, "[i]n essence, this means that a defendant must have violated 'clearly established' rights 'of which a reasonable person would have known.'" *Id*. (quoting *Harlow v. Fitzgerald*, 457 U.S 800, 818 (1982)). The *Spackman* court noted that the "flagrant violation requirement ensures that a government employee is allowed the ordinary

---

[2] Defendants reserve the right to address all the required elements at a later time.

'human frailties' of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation." *Id*.

Article 1, Section 9 of the Utah Constitutions states that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor." "The unnecessary rigor clause of the Utah Constitution protects persons arrested or imprisoned from the imposition of circumstances on them during their confinement that demand more of the prisoner than society is entitled to require. The restriction on unnecessary rigor is focused on the circumstances and nature of the process and conditions of confinement." *Dexter v. Bosko*, 184 P.3d 592, 596 (Utah 2008). The Utah Supreme Court stated in *Dexter* stated "[a] prisoner suffers from unnecessary rigor when subject to unreasonably harsh, strict, or severe treatment. This may include being unnecessarily exposed to an increased risk of serious harm." *Id*.

In this case, there is no evidence that Plaintiff was subjected to unnecessary rigor during the course of his detention and arrest. Indeed, as stated above, Plaintiff's physical resistance to the officers' attempts to detain him necessitated an escalation in the use of force that was wholly reasonable in light of Plaintiff's conduct. *See Youbyoung Park*, 680 Fed. Appx. at 739-40. Even if it is determined that the officers in question used more force than was necessary to effectuate the detention of Plaintiff, there is no evidence that the violation was flagrant. The flagrant violation element means that a defendant must have violated clearly established constitutional rights of which a reasonable person would have known. To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates that [constitutional] right. The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation. *Dexter*, 184 P.3d at 598. In this case, the police officers' use of force against Plaintiff was wholly commensurate with his erratic behavior and possession of a firearm. The officers present were required to make a split-second decision when Plaintiff physically resisted their attempt to detain him for further questioning. Plaintiff clearly presented a threat of harm to himself and others; there is no authority to support Plaintiff's claim that the officers violated a clearly established right that was sufficiently clear to give notice concerning the illegality of their conduct.

Finally, Plaintiff cannot establish a violation of his constitutional rights under Article 1, Section 14 of the Utah Constitution. Article 1, Section 14 protects persons against unreasonable searches and seizures. Even if Plaintiff can demonstrate that he was subjected to an unreasonable seizure in violation of this section, he cannot demonstrate that any such violation was the result of flagrant conduct on the part of the police officers. "The constitutionality of an investigative detention turns on the interconnection between the purpose of the stop and its subsequent scope." *State v. Worwood*, 164 P.3d 397, 407-08. In evaluating the scope of a stop, courts should consider "whether the police pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id*. Officers are not, however, "required to use the least intrusive means available in pursuing their investigation; the question is merely whether the police acted unreasonably in failing to pursue alternatives." *Id* (internal quotations omitted).

In this case, Plaintiff entered the police station and began acting in an irrational, erratic, and potentially dangerous manner. He indicated that he was being pursued and even threatened, that he suspected he was poisoned, and that he possessed a firearm. Those officers present in the lobby with Plaintiff observed his erratic behavior and determined that he was clearly a threat to himself and others. Because of that, Plaintiff was prevented from departing the police station until it could be determined that doing so would not put him at risk of committing or being the victim of violence—especially considering his possession of a firearm. Plaintiff was not told that he was under arrest, nor was he violently restrained. Instead, it was Plaintiff who immediately responded violently—thus precipitating the escalation of force. But the officers' initial detention of Plaintiff was reasonable and limited to ensuring that the risk of harm to Plaintiff was abated and that he would not pose a threat to others.

Even if it is determined that Plaintiff was subjected to an illegal detention and arrest, there is no evidence that any such violation was flagrant. Again, the officers present were confronted with volatile and unpredictable circumstances: a person in a state of mental agitation and anger in possession of a firearm and exclaiming that he was concerned about his physical safety. In their attempt to ensure that Plaintiff was not harmed, by himself or others, the officers determined that it was necessary to briefly detain Plaintiff for his protection. There is simply no support for Plaintiff's allegation that Defendants violated a "clearly established" right "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

IX. **The Utah Governmental Immunity Act precludes Plaintiff's claims for Intentional Infliction of Emotional Distress.**

Plaintiff's claim for damages caused by Defendants' intentional infliction of emotional distress is barred by the Utah Governmental Immunity Act. The Act specifies that:

> (4) A governmental entity, its officers, and its employees are immune from suit, and immunity is not waived, for any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with, or results from:
>
>> (b) assault, battery, false imprisonment, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, **infliction of mental anguish**, or violation of civil rights;…

Utah Code Ann. § 63G-7-201(4)(b). Any claim by Plaintiff for damages from emotional distress suffered as a result of Defendants' intentional conduct must fail. *See Atiya v. Salt Lake City*, 852 P.2d 1007, 1011 (Utah Ct. App. 1993).

## <u>CONCLUSION</u>

The Court should grant Defendants' Motion for Summary Judgment and other relief as deemed appropriate.

Respectfully Submitted,

DATED this 19th day of March, 2018.

**SMITH KNOWLES, P.C.**

  /s/   Stephen F. Noel            .
Stephen F. Noel
Thomas Walker Farrell
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2018, a true and correct copy of the foregoing document was sent via email to the following:

M. Tanner Clagett
HEPWORTH MURRAY & ASSOCIATES
140 South Main Street
Bountiful, UT 84010
tanner@hepworthlegal.com

 /s/ Shannon Strausbaugh
Paralegal